IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
MEMPHIS DIVISION

| | |
|---|---|
| JEAN REYES, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) Civil Action, Case No.: _____ |
| v. | ) |
| | ) JURY DEMAND |
| JOHN S. WILDER YOUTH DEVELOPMENT | ) |
| CENTER, STATE OF TENNESSEE, | ) |
| DEPARTMENT OF CHILDREN'S SERVICES, | ) |
| | ) |
|       Defendant. | ) |

## COMPLAINT

NOW COMES the Plaintiff, Jean Reyes, by and through her undersigned counsel, and for her Complaint states as follows:

### NATURE OF THE COMPLAINT

1. This is a civil action arising under the laws of the United States, and is brought pursuant to Title VII of the *Civil Rights Act of 1964*, as amended, 42 U.S.C. § 2000 *et seq*.

### THE PARTIES

2. Plaintiff is currently a resident of Weakley County, Tennessee who was, at the time of Defendant's unlawful acts, an employee of Defendant John S. Wilder Youth Development Center, State of Tennessee, Department of Children's Services.

3. Defendant John S. Wilder Youth Development Center is a division of the State of Tennessee, Department of Children's Services. Its registered agent for service of process is Kathryn O'Day, Commissioner, Department of Children's Services, State of Tennessee, who

may be served at Department of Children's Services, 436 Sixth Avenue North, Nashville, Tennessee 37243.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Ms. Reyes' claims pursuant to Title VII of the *Civil Rights Act of 1964,* as amended, 42 U.S.C. § 2000 *et seq.*

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial portion of the acts giving rise to this lawsuit occurred in this judicial district and Defendant conducts business and employed Plaintiff in Fayette County, Tennessee, which is located in this judicial district.

6. Ms. Reyes filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission, a copy of which is attached hereto as Exhibit A. The EEOC issued a Determination in which it concluded that Defendant engaged in illegal sexual harassment and retaliation. A copy of the EEOC's determination is attached hereto as Exhibit B. Ms. Reyes thereafter received a Notice of Right to Sue from the Department of Justice with respect to the charges set forth below less than ninety days prior to the filing of this Complaint. A copy of Ms. Reyes' Notice of Right to Sue Letter is attached hereto as Exhibit C.

## FACTUAL BACKGROUND

7. Defendant operates a facility that houses juveniles aged twelve to nineteen who have committed felony crimes. In or about December 2007, Defendant hired Ms. Reyes to be a Children's Services Officer. In that position, Ms. Reyes was responsible for helping to oversee the safety, security, and control of the school and campus at which it housed the juvenile offenders.

8. Lieutenant Kelvin Starks was Ms. Reyes' immediate supervisor. Upon information and belief, Lt. Starks was a serial sexual harasser who has engaged in sexual harassment of and/or inappropriate relationships with multiple female employees. Despite its knowledge of this history, Defendant failed to take any action to protect Ms. Reyes from sexual harassment by Lt. Starks.

9. Lt. Starks engaged in inappropriate behavior from his first contact with Ms. Reyes. During Ms. Reyes' interview for the Children's Services Officer position, Lt. Starks flirted with Ms. Reyes and gave her an inappropriate amount of attention.

10. On or about January 3, 2008, Ms. Reyes began her training for the Children's Services Officer job. The training program lasted twelve weeks, during which Ms. Reyes and other trainees alternated one week at the academy in Tullahoma, Tennessee with one week of work at Defendant's facility.

11. Starting immediately after she reported to Defendant's facility, Lt. Starks made numerous sexual remarks to and advances toward Ms. Reyes. He commented about how soft her lips might feel to him, licked his lips when Ms. Reyes looked in his direction, blew kisses to her, and flirted with her on a daily basis during her training time at the facility.

12. On January 12, 2008, Lt. Starks called Ms. Reyes to come in to work then assigned her to work in the control room. Lt. Starks stayed in the control room and made a series of sexual comments to Ms. Reyes. He asked Ms. Reyes if it made her nervous when he looked at her body and said she had a beautiful body. Ms. Reyes' hands began to shake and she became nervous. Lt. Starks noted her nervousness and told her she could leave the control room and go home. Ms. Reyes left work and went home.

13. Later on January 12, 2008, Lt. Starks called Ms. Reyes' cell phone and left a message saying he was worried about her. Lt. Starks stated that he was calling to check on Ms. Reyes while his wife was out of the room.

14. Later in January 2008, Lt. Starks followed Ms. Reyes into the lunch room. Lt. Starks blocked the exit, preventing Ms. Reyes from leaving, then grabbed Ms. Reyes and held her in a tight bear hug. While her movement was restricted, Lt. Starks forcibly kissed Ms. Reyes on her mouth.

15. On February 29, 2008, Lt. Starks called Ms. Reyes into his office and asked Ms. Reyes if he could kiss her lips. Ms. Reyes refused his overture. Lt. Starks responded that he would have to break Ms. Reyes from her shyness even though he found it "cute." Lt. Starks then asked Ms. Reyes again if he could kiss her lips to see if they were as soft as they looked. Before she could refuse this advance, Lt. Starks grabbed Ms. Reyes, pulled her to him, and kissed her on the lips. Ms. Reyes left the office and got sick to her stomach.

16. Lt. Starks forcibly kissed Ms. Reyes on one other occasion and made sexual comments to her on an almost daily basis.

17. After that incident, before leaving for her final trip to the training academy in Tullahoma, Ms. Reyes discussed the situation with Captain Howell, Lt. Starks' direct supervisor. Ms. Reyes described Lt. Starks' behavior and said she did not know how to handle the situation because Lt. Starks' wanted a sexual relationship with her but she was not willing to do that. Captain Howell laughed throughout this conversation and only told her to keep doing her training and her job.

18. On March 2, 2008, Lt. Starks called Ms. Reyes while she was on her way to Tullahoma to take the test that would complete the training for her position. Lt. Starks said he expected Ms. Reyes to call him when she checked in to her hotel to give him her room number.

19. On March 3, 2008 at 5:21 p.m., Lt. Starks called Ms. Reyes' cell phone. Ms. Reyes ignored the call. At 5:22 p.m., she received a voice mail message in which Lt. Starks angrily said that Ms. Reyes had not done as he had told her because she had not called and given him her hotel room number. Later at 5:30 p.m., Lt. Starks again called Ms. Reyes' cell phone but she ignored the call.

20. Then, also on March 3, 2008, Lt. Starks called Ms. Reyes' hotel room phone. When Ms. Reyes answered the phone, Lt. Starks told her that he was mad because he had to hunt her down to find out her room number. Lt. Starks then asked Ms. Reyes why she was hiding from him. Ms. Reyes told Lt. Starks that she just wanted to be a hard-working and God-fearing woman. Ms. Reyes then asked Lt. Starks for her Post Assignment Letter. Lt. Starks said Ms. Reyes had been given a good assignment but she would not receive her Post Assignment Letter until after she had sex with him. Lt. Starks said he could change her post assignment any time he wanted and the nature of her assignment would depend on how "sweet" she acted to Lt. Starks while they were in Tullahoma.

21. After Ms. Reyes hung up the phone, she stayed up all night crying and fearful that Lt. Starks would try to come to her room.

22. On March 4, 2008, Ms. Reyes called Captain Howell. Ms. Reyes informed Captain Howell that Lt. Starks had made sexual advances toward her and said that her job assignment depended on how "sweet" she was willing to be to him. Ms. Reyes informed Captain

Howell that she had packed up her belongings and that she thought she was going to have to quit because she would not give in to Lt. Starks' demands that she have sex with him.

23. Captain Howell told Ms. Reyes not to quit and to finish her training and testing so she could graduate the following Friday. He said he would talk to Lt. Starks and prevent any retaliation.

24. Despite Lt. Starks' previous statement, around 9:00 p.m. that evening, Ms. Reyes found her Post Assignment Letter under the windshield wiper of her truck. It stated that she had been assigned to the secure unit where the students are on twenty-four-hour lockdown. The letter identified Lt. Starks as Ms. Reyes' direct supervisor.

25. On March 12, 2008, Lt. Starks called Ms. Reyes' cell phone and said he was sorry for everything. Then, he asked what she had discussed with another female employee and told her not to listen to the other female employee because she was a liar.

26. Soon thereafter, Lt. Starks began making baseless complaints about Ms. Reyes and placing her in unsafe situations of his making in order to ensure Ms. Reyes could not successfully perform her job.

27. On March 21, 2008, Lt. Starks posted Ms. Reyes in Dorm 6 instead of her usual post assignment in the secure unit. Dorm 6 is a more dangerous post because it is high-security Dorm housing aggressive offenders. Ms. Reyes instructed the students not to "rap" because it would elevate their behavior to an out of control state. Lt. Starks, although he was aware that Ms. Reyes ordered the students not to rap for security reasons, entered Dorm 6 and told the students to rap for him. Lt. Starks then left the Dorm with the students rapping and beginning to curse and beat on the furniture.

28.     Ms. Reyes complained again to Captain Howell, telling him that Lt. Starks was retaliating against her by encouraging the students to get out of control during her shift. Captain Howell assured Ms. Reyes that Lt. Starks would no longer be her supervisor and that she would be assigned another supervisor.

29.     Yet, on March 22, 2008, Lt. Starks notified Ms. Reyes of a new mandatory morning briefing she had to attend before taking her post every work day. Lt. Starks told Ms. Reyes that he would conduct these briefings and she would still be under his command.

30.     After the briefing that day, Lt. Starks again sent Ms. Reyes to Dorm 6 instead of her normal post assignment. Lt. Starks entered Dorm 6 several times during Ms. Reyes' shift and encouraged the students to get out of control by instructing them to rap, during which the students began cursing and banging on the tables and furniture of the Dorm. Once the students got out of control, Lt. Starks would leave the Dorm, leaving Ms. Reyes to calm the students.

31.     Also during that shift, while Ms. Reyes and Officer Remus Williams were walking a line of students across the campus with Ms. Reyes at the back of the line and Officer Williams at the front of the line, Lt. Starks called Officer Williams away from the line, which left Ms. Reyes alone with a line of students while Lt. Starks watched the line of students become confused about where to go next. Lt. Starks then loudly reprimanded Ms. Reyes for not having control of the line of students in the presence of the students as she single-handedly worked to get them back in an organized line.

32.     After these events, later on March 22, Ms. Reyes spoke to the Superintendent about the situation. She told the Superintendent about Lt. Starks' sexual advances and retaliation against her. She said she was afraid for her safety. The Superintendent told Ms. Reyes "don't be ridiculous" and said she was being "silly." Regardless, Ms. Reyes asked to file a complaint

about Lt. Starks' conduct, but the Superintendent said she could not do so until March 26. The Superintendent then sent an e-mail to Lt. Starks and Captain Howell advising them about Ms. Reyes' visit to his office.

33. On March 26, 2008, Ms. Reyes filed a complaint with the State of Tennessee, Department of Personnel against Lt. Starks and Defendant for Lt. Starks' sexual harassment of Ms. Reyes.

34. On March 27, 2008, Lt. Starks removed Ms. Reyes from her normal post and posted her outside the door to his office. There, he intimidated Ms. Reyes by giving her stern and aggressive looks each time he entered and exited his office.

35. On March 28, 2008, Lt. Starks again removed Ms. Reyes from her normal post and posted her outside his office door where he intimidated Ms. Reyes each time he exited and entered his office. Lt. Starks also told Ms. Reyes he would assign her to a worse post the following day.

36. On March 29, 2008, Lt. Starks ordered Ms. Reyes to Dorm 4 where she was responsible for taking the students in and out of several different buildings all day in the rain.

37. On March 30, 2008, Lt. Starks was not at the facility to brief Ms. Reyes on her post for her shift that day. Nevertheless, he left word with another supervising officer to post Ms. Reyes in a Dorm instead of her regular assigned post at the school.

38. On April 2, 2008, Lt. Starks continued to intimidate Ms. Reyes during her morning briefing by making aggressive remarks and telling her she was unable to do the job.

39. On April 16, 2008, Lt. Starks again called Ms. Reyes in for briefing on her shift post. During the briefing, Lt. Starks made aggressive and derogatory remarks regarding Ms. Reyes' job performance.

40. On April 18, 2008, Lt. Starks told Ms. Reyes she would be suspended if she gave him any "attitude."

41. On April 19, 2008, Lt. Starks ordered Ms. Reyes to take a line of students from Dorm 4 to the end of the walk and to wait for Officer Dennis. Lt. Starks came out of the building and watched her walk the students in a line. Lt. Starks later criticized Ms. Reyes, claiming her line of students was not "tight enough" and that she should "make them walk at the exact same pace she was walking." Lt. Starks had never commented on the pace at which a line of students walked before this incident or to any other employee.

42. Between April 20 and April 27, 2008, Lt. Starks continued to remove Ms. Reyes from her regular post and assign her to more difficult or dangerous work units and to instruct other supervisors to do the same.

43. On April 29, 2008, Ms. Reyes filed a Charge of Discrimination with the Equal Employment Opportunity Commission concerning Lt. Starks' sexual harassment and retaliation against her.

44. The following week, Lt. Starks continued to give Ms. Reyes more dangerous work assignments, including, on May 4, 2008, assigning her to Dorm 2. Dorm 2 is where the newly arriving students are housed, regardless of whether they are under the influence of drugs or have committed sexual offenses, until their aggression level is assessed.

45. On May 7, 2008, Lt. Starks sent Corporal Jenkins to hand-deliver two written disciplinary warnings to Ms. Reyes relating to events from March 22, 2008, in which a pen had been stolen from a post that another individual had abandoned and at which Ms. Reyes was not posted.

46. Sometime between May 7 and May 10, Ms. Reyes told Corporal Jenkins that she felt sick and that walking was exacerbating her illness. After Corporal Jenkins told Lt. Starks, Lt. Starks made Ms. Reyes walk across campus twice.

47. On May 10, 2008, Lt. Starks again assigned Ms. Reyes to Dorm 2 instead of her regular post assignment.

48. On May 11, 2008, Lt. Starks again assigned Ms. Reyes to Dorm 2. While she was there, a male officer told other male employees that no one should mention documenting anything around Ms. Reyes because she might get ideas.

49. On May 14, 2008, an investigator from the State came to speak with Captain Howell concerning Ms. Reyes' complaints against Lt. Starks. Captain Howell told Ms. Reyes and the investigator that Lt. Starks was wrong for giving write-ups to Ms. Reyes on May 7.

50. On May 15, 2008, male co-workers would not speak to Ms. Reyes. No male officers responded when she radioed for assistance at her post.

51. On May 16, 2008, Ms. Reyes was summoned to Captain Howell's office where she was terminated.

## COUNT I

### DISCRIMINATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964

### Hostile Work Environment

52. The allegations contained in Paragraphs 1 – 51 are hereby incorporated by reference as if set forth fully in this section.

53. Defendant's actions constitute discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*

54. Lt. Starks' actions created an unwelcome and hostile working environment for Ms. Reyes.

55. Defendant failed to take any corrective action in order to protect Ms. Reyes and to prevent a hostile working environment.

56. Gender was a motivating factor in Defendant's adverse treatment of Ms. Reyes.

57. Defendant's discriminatory actions on the basis of Ms. Reyes' gender were willful and knowingly committed.

58. As a direct and proximate result of the Defendant's adverse treatment of Ms. Reyes in violation of Title VII of the Civil Rights Act of 1964, Ms. Reyes was injured and suffered damages.

59. Ms. Reyes has sustained a loss of back pay, benefits, incidental expenses, and front pay.

60. Defendant engaged in discriminatory practices alleged in this first cause of action with malice and/or with reckless indifference to Ms. Reyes' federally protected rights, making Defendant liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981a(a) & (b).

### COUNT II

### DISCRIMINATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964

#### *Quid Pro Quo*

61. The allegations contained in Paragraphs 1 – 60 are hereby incorporated by reference as if set forth fully in this section.

62. Defendant's actions constitute discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*

63. Lt. Starks' demanded kissing, sexual favors, and/or other inappropriate conduct from Ms. Reyes in exchange for the opportunity to perform her job and hindered Ms. Reyes' ability to perform her job when she refused his advances.

64. Defendant failed to take any corrective action in order to protect Ms. Reyes.

65. Gender was a motivating factor in Defendant's adverse treatment of Ms. Reyes.

66. Defendant's discriminatory actions on the basis of Ms. Reyes' gender were willful and knowingly committed.

67. As a direct and proximate result of the Defendant's adverse treatment of Ms. Reyes in violation of Title VII of the Civil Rights Act of 1964, Ms. Reyes was injured and suffered damages.

68. Ms. Reyes has sustained a loss of back pay, benefits, incidental expenses, and front pay.

69. Defendant engaged in discriminatory practices alleged in this second cause of action with malice and/or with reckless indifference to Ms. Reyes' federally protected rights, making Defendant liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981a(a) & (b).

## COUNT III

### RETALIATION IN VIOLATION OF TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964

70. The allegations contained in Paragraphs 1 – 69 are hereby incorporated by reference as if set forth fully in this section.

71. Defendant's actions constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* The job assignments given to Ms.

Reyes and Defendant's termination of Ms. Reyes were a direct and proximate result of her refusal to acquiesce to and complaints and charges she filed based on the sexual advances and inappropriate conduct of Lt. Starks.

72. Defendant's retaliation against Ms. Reyes was willful and knowingly committed.

73. As a direct and proximate result of Defendant's retaliation, Ms. Reyes was injured and suffered damages.

74. Ms. Reyes has sustained a loss of back pay, benefits, incidental expenses, and front pay.

75. Defendant engaged in the retaliatory practices alleged in this third cause of action, with malice and/or with reckless indifference to Ms. Reyes' federally protected rights, making Defendant liable for compensatory and punitive damages pursuant to 42 U.S.C. § 1981a(a) & (b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

1. That the Defendant be served and required to answer within the time prescribed by law;

2. That a jury of twelve try this cause;

3. That upon the hearing of this cause, the Plaintiff be awarded judgment for damages of lost compensation she has lost from the date of Defendant's discriminatory and retaliatory actions, in an amount to be proven at trial;

4. That the Court issue an award of front pay, in an amount to be proven at trial, in lieu of reinstatement because the actions described herein and the circumstances surrounding the place of employment have made reinstatement impossible;

5. That the Plaintiff be awarded additional compensatory damages pursuant to 42 U.S.C. § 1981a(a) & (b), including but not limited to, damages for emotional distress, pain and suffering, embarrassment, and humiliation, in an amount to be proven at trial;

6. That costs and discretionary costs be taxed against the Defendant;

7. That costs and attorney fees be assessed against the Defendant pursuant to 42 U.S.C. § 2000e-5(k);

8. That such other remedies as shall be necessary and proper to eliminate all violations complained of herein be awarded;

9. That punitive damages be awarded against the Defendant pursuant to 42 U.S.C. § 1981a(a) & (b) in an amount to be established at trial; and

10. For such other and further relief as this court may find appropriate.

Respectfully submitted,

s/ D. Wes Sullenger
D. Wes Sullenger, KY BAR # 91861
TN BPR # 021714

Sullenger Law Office, PLLC
2320 Broadway, Suite 407
Paducah, KY  42001
Voice: (270) 443-9401
Fax:    (270) 443-3624

wes@sullengerfirm.com

*Attorneys for the Plaintiff,*
*Jean Reyes*